## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHAWLAWN BECKFORD,
12420 Paseo Alegre Drive
El Paso, TX 79928,

      Plaintiff,

      v.

MARK T. ESPER, in his official capacity as
Secretary, Department of the Army,
101 Army Pentagon
Washington, D.C. 20310,

      Defendant.

Civ. No. 1:18-cv-00940

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Shawlawn Beckford ("Plaintiff" or "Ms. Beckford"), by and through counsel, hereby files this Complaint against Defendant Mark T. Esper, in his official capacity as Secretary of the United States Department of the Army ("Defendant" or "Army"), and alleges as follows:

## INTRODUCTION

1.     Ms. Beckford, an African-American woman, is a dedicated and long-serving Army employee who endured a hostile work environment at Brian Allgood Army Community Hospital ("BAACH") on the United States Army installation in Yongsan, Seoul, South Korea, where she was stationed and served as a civilian hospital administrator from January 2009 through November 2015.  The abuse Ms. Beckford suffered at the hands of both her superiors and contemporaries at BAACH included frequent race- and gender-based comments and demeaning and unwelcome behavior because of her sex.

2.     Despite Ms. Beckford's years-long efforts to work with Army leadership and Equal Employment Opportunity ("EEO") officers to expose – and encourage the Army to eradicate – the hostile work environment infecting BAACH, the Army disregarded Ms. Beckford's repeated overtures.  As a result, the harassing and discriminatory behavior directed towards Ms. Beckford continued unabated throughout her tenure at BAACH.

3.     Further compounding the indignities Ms. Beckford confronted during her employment at the hospital, rather than validate and address Ms. Beckford's very serious complaints, the Army retaliated against Ms. Beckford for engaging in protected EEO activity. Among other things, after Ms. Beckford began speaking out about the hostile work environment at BAACH, her superiors punished her with additional and uncompensated work duties, denied her pay raises that were offered to similarly-situated employees, and excluded her from important e-mail communications and meetings involving her team.

4.     Ultimately, having had her grievances ignored and belittled by the Army for more than five years, and having suffered a significant deterioration of the conditions of her employment as the result of the Army's retaliation – despite years of exemplary performance and consistently positive reviews – Ms. Beckford determined that she no longer could remain employed at BAACH and resigned her position.  Ms. Beckford has since transferred to civilian positions on Army bases in the United States.  As a further result of the Army's discriminatory conduct, its callous responses to Ms. Beckford's complaints, and the resulting retaliation, Ms. Beckford has suffered, and will continue to suffer, irreparable loss and injury, including but not limited to humiliation, embarrassment, mental and emotional distress, and anxiety.

5.     This lawsuit seeks to redress Ms. Beckford's suffering and – by finally putting an end to the unacceptable and discriminatory workplace environment at BAACH – to ensure that

no other BAACH employees are subjected to the kind of humiliation and retaliation

Ms. Beckford endured.  Ms. Beckford claims hostile work environment and retaliation in

violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

("Title VII").

6.      On the basis of the violations asserted herein, Ms. Beckford seeks declaratory and

injunctive relief and compensatory damages to redress the injuries she suffered as a result of the

Army's unlawful conduct.  Ms. Beckford also seeks attorneys' fees and costs of suit, as well as

any other relief this Court deems proper.

## PARTIES

7.      Plaintiff Shawlawn Beckford is an African-American female currently residing in

El Paso, Texas.  Ms. Beckford is – and was at all times relevant to this Complaint – a civilian

employee of the United States Department of the Army.

8.      Defendant Mark T. Esper is the Secretary of the United States Department of the

Army, a federal government agency with its principal offices located in the District of Columbia.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction over all Counts pursuant to 28 U.S.C. § 1331

because these claims arise under the laws of the United States.

10.      Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because Defendant

Esper performs his official duties in this judicial district.

11.      This Court may grant declaratory and injunctive relief pursuant to 28 U.S.C.

§§ 2201 and 2202.

## INVOCATION OF ADMINISTRATIVE REMEDIES

12.     Ms. Beckford timely filed a charge with the Equal Employment Opportunity

Commission ("EEOC") on March 17, 2015.

13.     Counsel for Plaintiff received the Department of the Army's January 8, 2018 final

decision by U.S. Mail on or around January 22, 2018.

14.     This Complaint is filed within ninety (90) days of the date of receipt of the final

decision.

## FACTUAL ALLEGATIONS

### I.     Ms. Beckford's Army Experience and Her Role and Performance at BAACH

18.     Ms. Beckford enlisted in the United States Army in 1993.  Ms. Beckford received

an honorable discharge in 2004, and thereafter took a position at a private aerospace and defense

company as a contractor.

19.     In February 2008, Ms. Beckford returned to the Army as a General Schedule

("GS")-11 civilian employee at the United States Army installation in Fort Jackson, South

Carolina.  At Fort Jackson, Ms. Beckford worked as a Practice Manager, which involved

providing data analysis to on-base clinics.

20.     In December 2008, Ms. Beckford received a promotion to the GS-12 pay

classification and transferred to the United States Army installation in Yongsan, Seoul, South

Korea.  On or around January 17, 2009, Ms. Beckford assumed the position of Deputy Chief of

the Clinical Support Division at BAACH, the Army hospital in Yongsan.  After the Chief of the

Clinical Support Division departed BAACH in mid-2009, Ms. Beckford became Acting Chief

and then Chief of Clinical Support.

4

21.     In her role as Deputy Chief/Chief of Clinical Support, Ms. Beckford was responsible for ensuring that BAACH (which served as the headquarters for all Army medical support in South Korea) and all of its affiliated health clinics had access to the proper equipment and personnel.  Specifically, her major duties included (1) specialist duties involving health care delivery systems and supporting optimization of the Military Health System and MEDDAC-K resources; (2) managing patient appointing; (3) serving as the expert authority for data retrieval and analysis; and (4) supervising various subordinate personnel across multiple working groups. Among other things, Ms. Beckford also was responsible for processing all employee awards during her tenure at BAACH.

22.     At all times relevant, Ms. Beckford reported directly to the Deputy Commander of Clinical Services.  As Ms. Beckford's superior, the Deputy Commander of Clinical Services served as Ms. Beckford's "rater."  During Ms. Beckford's tenure at BAACH, the role of Deputy Commander of Clinical Services was filled by Major Alex Hayman, Lieutenant Colonel Sharon McKiernan, Lieutenant Colonel John Barrett, Lieutenant Colonel Eduardo Vidal, Lieutenant Colonel Marie Dominguez, and Lieutenant Colonel Katrina Hall, respectively.  In addition, at all times relevant, Ms. Beckford's "senior rater" was the Hospital Commander.  Both the Hospital Commander and the Deputy Commander positions are reserved for military personnel.

23.     At all times during her employment at BAACH, Ms. Beckford met – and, in fact, far exceeded – her employer's expectations.  Throughout Ms. Beckford's tenure at BAACH, she had no record of performance or behavioral actions, and never received negative counseling. Furthermore, BAACH leadership consistently praised Ms. Beckford's work ethic, abilities, and commitment to BAACH's mission.  For example, Command Sergeant Major of BAACH from May 2012 through February 2014, Andrew Rhoades, testified to the Department of Defense

Defense Civilian Personnel Advisory Service Investigations and Resolutions Director that

Ms. Beckford was "an extremely hard worker, who worked well outside of her [position

description]."  Similarly, Lieutenant Colonel Dominguez testified that Ms. Beckford was

"dedicated."  Indeed, Ms. Beckford's performance was so exemplary that she was named one of

three Pacific Regional Medical Command Civilian Employees of the Year in 2013.[1]

## II.    The Hostile Work Environment at BAACH and Ms. Beckford's Efforts To Combat the Discrimination

24.    Shortly after Ms. Beckford began working at BAACH, various individuals in

leadership and supervisory roles at the hospital, as well as certain other of Ms. Beckford's

colleagues, began subjecting her to discrimination and ongoing harassment creating a hostile

work environment based on her race and gender.  The hostile work environment at BAACH was

so severe and pervasive that it altered the conditions of her employment.  Despite

Ms. Beckford's repeated attempts to report this conduct, the hostile work environment continued

unabated throughout Ms. Beckford's tenure at BAACH.

*a.      Beginning in 2009, Command Sergeant Major Nickevett Carey Repeatedly Directs Gendered Insults and Racial Slurs at Ms. Beckford and Other Employees*

25.    From approximately August 2009 to January 2010, Ms. Beckford was harassed

and discriminated against by Command Sergeant Major Nickevett Carey, an African-American

male.  As then-Command Sergeant Major of BAACH, Carey held a high-level leadership role in

the Command Suite inferior only to the Hospital Commander.

---

[1] *See* Capt. Joshua Gscheidmeier, *PRMC names Civilian Employee of the Year winners*, Army.mil (May 13, 2014), *available at* https://www.army.mil/article/125911/prmc_names_ civilian_employee_of_the_year_winners.

26.     On a weekly basis during that time period, Carey would visit Ms. Beckford's office and make belligerent, gendered comments towards her.  For example, he told her "You're a single parent.  You're a slut."

27.     On several occasions, Carey also made racially discriminatory remarks to Ms. Beckford, including telling her that she was "just a house nigger" or "dumb nigger," that she was "our token Black person" in the Command Suite, and that she was "ghetto."

28.     In addition to these racial slurs aimed at Ms. Beckford, Ms. Beckford also witnessed Carey make offensive and racially charged remarks about other African-American employees at BAACH.  For example, Ms. Beckford repeatedly witnessed Carey refer to his supervisor, Hospital Commander Ronald Smith – an African-American male – as "Obama" and "master"; Carey would state to Ms. Beckford and other African-American employees that "master wants us to work."  Ms. Beckford also witnessed Carey repeatedly target her direct reports.  Specifically, Carey regularly referred to Ms. Beckford's subordinates as "niggers," and made offensive and threatening comments like "What are you niggers doing here?  You know that master is going to come in here."

29.     On or around December 23, 2009, Carey visited Ms. Beckford's office and began berating her, telling her that no one wanted her to have her job, and that she was "good for nothing" and a "slut."  Ms. Beckford became so distressed by her encounter with Carey that she ran out of her office in tears.  Thereafter, a Brigade Sergeant Major at BAACH came upon Ms. Beckford, and Ms. Beckford informed him of Carey's repeated conduct.

30.     After hearing Ms. Beckford describe Carey's discriminatory and abusive comments, the Brigade Sergeant Major took Ms. Beckford to see her then-rater/supervisor, Deputy Commander of Clinical Services Lieutenant Colonel Sharon McKiernan.  Ms. Beckford

reported Carey's conduct to McKiernan, who then assisted Ms. Beckford in contacting an Army Equal Opportunity ("EO") representative.

31.     Thereafter, an EO representative reported to McKiernan's office to discuss Ms. Beckford's complaint with McKiernan and Ms. Beckford.  While the representative was in McKiernan's office, Carey came upon them and demanded to know what was going on.  The EO representative walked Ms. Beckford to her office so that the two could continue speaking in private, but Carey followed them and continued to ask Ms. Beckford what she was discussing with the EO representative.  When the EO representative disclosed to Carey that Ms. Beckford was making an internal investigation complaint against him, Carey begged Ms. Beckford not to file the complaint.  Ms. Beckford asked the EO representative to remove Carey from her office, but later that day Carey approached Ms. Beckford in the hallway when she was alone and again sought to dissuade her from filing her complaint, telling her that such a complaint would destroy his family.  Ms. Beckford resolved to continue with her complaint notwithstanding Carey's harassment and intimidation.

32.     As the result of Ms. Beckford's complaint, then-Hospital Commander Ronald Smith initiated an Army Regulation 15-6 commander internal investigation ("15-6 investigation") into Carey's misconduct.  On or around January 14, 2010, Ms. Beckford met with the Army investigator in her office for an interview.  During the interview, the investigator openly was suspicious of Ms. Beckford's complaint; for example, he asked her if she was "sure [Carey] wasn't using nigger in slang, you know, the way you talk?"  At the end of the interview, the investigator asked Ms. Beckford to provide a written sworn statement describing Carey's harassing conduct, which she subsequently submitted via e-mail.

33.     The investigator ultimately found that Carey used disparaging terms toward Ms. Beckford and others – including using the word "nigger" – but reasoned that Carey did not use these terms in a discriminatory manner since Carey himself was African-American.  The investigator further found that Carey made offensive and inappropriate comments by telling Ms. Beckford that she was "ghetto" and that she was "a dumb nigger."  The investigator recommended that Carey be relieved of his position, receive a referred evaluation report, receive a General Officer letter of reprimand, and be denied reassignment to a leadership position. Because Carey left the Army after he departed BAACH – and had been planning to retire from the Army before he was relieved of his position – none of these purported punishments had any meaningful impact on his military career.  The investigator further recommended that BAACH senior leaders conduct a command environment "sensing session" for non-commissioned officers and soldiers, and that they educate leaders on their roles and responsibilities if they hear of workplace issues.

34.     Approximately one month after Commander Smith initiated the 15-6 investigation, Smith informed Ms. Beckford that the investigation was complete and that the Army would address Carey's actions.  Ms. Beckford never received a copy of the investigative file, nor was she informed of her option to initiate a formal EEO complaint regarding Carey's behavior.

35.     Furthermore, despite Smith's assurances that Army leadership would address Carey's behavior, Carey continued to harass and intimidate Ms. Beckford even after the 15-6 investigation had concluded.  Among other things, Carey repeatedly confronted Ms. Beckford to try to justify his behaviors, telling Ms. Beckford that he was only her "Uncle Nick," that his comments were only meant to help her, and that – because both Ms. Beckford and Carey are

African-American – they needed to "stick together."  In fact, Carey's inappropriate behavior

towards Ms. Beckford ended only when he departed BAACH and Yongsan in 2010.

      b.    *In 2010 and 2011, Major Steven Richter Repeatedly Uses Foul and Degrading Language About Women in Ms. Beckford's Presence*

    36.    Ms. Beckford continued to confront a hostile work environment at BAACH after

Carey's departure.  From 2010 through 2011, Ms. Beckford repeatedly was subjected to the

degrading and derogatory conduct of Major Steven Richter, a Caucasian male, who in 2010

assumed the role of Deputy Chief of the Clinical Support Division – a position under

Ms. Beckford's supervision.

    37.    Before Richter was assigned to that position, a former coworker of Richter's had

warned Ms. Beckford that Richter "had a foul mouth."  Once Richter assumed his position as

Deputy Chief, Ms. Beckford experienced Richter's inappropriate and insulting comments

firsthand.  On several occasions, Richter referred to females using derogatory terms; for

example, "bitches" and "clowns."  Although Richter never used one of those terms to describe

Ms. Beckford, he regularly used this foul and demeaning language in her presence.

    38.    On or around August 5, 2011, Ms. Beckford contacted Linda Galimore – who was

at the time employed in the Army EEO office in Yongsan – about Richter's discriminatory

comments about women.  Galimore arranged a mediation between Ms. Beckford, Richter, and

Ms. Beckford's then-rater/supervisor, Lieutenant Colonel Dominguez.

    39.    The mediation took place on or around November 12, 2011.  During the

mediation, Galimore directed Richter to stop using the offensive language Ms. Beckford

reported, and she further recommended that he complete EEO training.  Galimore did not

provide Ms. Beckford with a written report of the mediation or any other written documentation.

40.     Following the mediation, Richter refused to speak to Ms. Beckford directly, but he continued to make offensive and degrading comments about Ms. Beckford to other BAACH employees.  On information and belief, the Army never punished or reprimanded Richter for his behavior.

c.     *From 2010 through 2013, Colonel John Barrett Demeans and Degrades Ms. Beckford Based on Her Gender*

41.     Also beginning in 2010, Ms. Beckford was harassed and discriminated against by Lieutenant Colonel John Barrett, a Caucasian male who in late 2010 replaced Colonel McKiernan as Deputy Commander of Clinical Services, and as a result became Ms. Beckford's rater/supervisor.

42.     Soon after assuming that role, Barrett began treating Ms. Beckford in a demeaning and degrading manner on the basis of her gender; for example, Barrett demanded that Ms. Beckford go grocery shopping for him or make him plates of food – tasks that were not part of her job requirements, but that Ms. Beckford believed Barrett viewed as stereotypically female obligations.

43.     Ms. Beckford met with Barrett and Army Chaplain Brady Lanoue to discuss Barrett's conduct.  During that conversation, Barrett made several offensive comments about women, including that "women are only good for purse shopping."  Upon hearing Barrett's remarks, Chaplain Lanoue suggested to Ms. Beckford that she find a new job because Barrett was "crazy."

44.     Barrett's offensive and harassing behavior continued after her meeting with Barrett and the chaplain.  In early 2013, Ms. Beckford called EEO employee Galimore and reported Barrett's discriminatory conduct.  During that phone call, Galimore asked Ms. Beckford

to e-mail her a description of her meeting with Barrett and Lanoue, which Ms. Beckford sent to Galimore the same day.

45.     On or around March 16, 2013, Ms. Beckford e-mailed her then-senior rater, Colonel Robert Forsten, a Caucasian male and the Commander of BAACH.  In the e-mail, which also carbon-copied Galimore, Ms. Beckford described Barrett's behavior towards her.  Ms. Beckford also requested a meeting with Forsten and Barrett, and she asked that Galimore attend in her capacity as an EEO mediator.

46.     The meeting took place on or around March 18, 2013, and included Ms. Beckford, Forsten, Galimore, Barrett, and then- Command Sergeant Major of BAACH Rhoades. The night before the meeting, Forsten requested – and Ms. Beckford provided – a list of concerns for discussion.  At the outset of the meeting, Forsten questioned why Galimore was present, and expressed suspicion about the possibility of Ms. Beckford filing an EEO complaint.  Ms. Beckford reiterated to Forsten that she sought Galimore's presence as a mediator to attempt – in the first instance – to resolve her issues with Barrett without having to escalate her complaints through more formal EEO procedures.  Forsten then stated that he could not believe Ms. Beckford's accusations of Barrett because he believed Barrett to be a "good guy."  However, during the mediation Barrett admitted to the conduct Ms. Beckford had accused him of – including that he frequently asked Ms. Beckford to fix him plates of food and go grocery shopping for him – and Forsten apologized to Ms. Beckford for doubting her allegations.

47.     At that point, Forsten and Rhoades left the room and urged Ms. Beckford, Galimore, and Barrett to attempt to resolve Ms. Beckford's concerns.  As the result of the mediation, the parties agreed that Barrett and Ms. Beckford would meet once a week to ensure

more effective communications, and that Barrett and the entire Command Group at BAACH

would receive EEO training.

48.     Nevertheless, Barrett continued his pattern of discriminatory and degrading

conduct towards Ms. Beckford.  For example, Barrett continued to make derogatory comments

about women, and in fact told Ms. Beckford that he would not take business meetings with her

because he did not want hospital command to think he wanted to sleep with her.

> d.      *Command Sergeant Major Christopher Irwin Continuously Directs Racially*
> *Charged Insults Towards Ms. Beckford's Colleagues and Subordinates*

49.     In 2013, Christopher Irwin, a Caucasian male, assumed the position of Command

Sergeant Major of BAACH, and also contributed to the hostile work environment Ms. Beckford

endured at BAACH.

50.     On several occasions, Ms. Beckford personally witnessed or was made aware of

racist comments made by Irwin to her colleagues.  For example, Ms. Beckford had been

informed that Irwin referred to African-American soldiers as "monkeys acting up in the

barracks."

51.     In or around May 2014, Irwin told one of Ms. Beckford's subordinates, Audrey

Robinson-Fuller, an African-American female, that "my dogs don't like Black people and I'll set

them on you."  Irwin also told Robinson-Fuller during that conversation that "Black people get

juice and head grease on my headboards."  Upset by the conversation, Robinson-Fuller began

walking away and Irwin shouted, "Come back, the ghetto called and they want their bling back."

Irwin later admitted to the Department of Defense Defense Civilian Personnel Advisory Service

Investigations and Resolutions Directorate that he made some of these statements, including

telling Robinson-Fuller that the ghetto "want[ed] their bling back."

52.     After news spread of the incident between Robinson-Fuller and Irwin, an Army EEO officer approached Robinson-Fuller and asked her to provide a statement regarding what had happened.  Robinson-Fuller did not want to file an EEO complaint because she was set to leave BAACH for a new position and she did not want the complaint to delay her departure. Ultimately, after repeated pressure from the Army EEO to file a statement, Robinson-Fuller acquiesced.

53.     After the May 2014 incident involving Irwin and Robinson-Fuller, Irwin approached Ms. Beckford and asked if she could arrange for him to apologize to Robinson-Fuller.  Ms. Beckford agreed, and arranged the meeting.  When Robinson-Fuller and Ms. Beckford arrived in Irwin's office for the meeting, Irwin was playing hip hop music.  He explained that he could not be racist because he had "Black music on [his] iPod" and was "raised by Black women from the projects."  He then made a series of racially insensitive remarks, including expressing frustration at "people get[ting] so spun up" during Black history month, and stated that, as a white person, he was offended when watermelon and chicken were served in the BAACH cafeteria on Martin Luther King, Jr. Day.

54.     Irwin subsequently asked to speak to Ms. Beckford to defend his behavior.  He continued to use degrading and racially charged language during this meeting, explaining to Ms. Beckford that he was "allowed" to make the comments he did because he "grew up in the projects," "had a black best friend," and was raised by "a black grandma."

**III.    The Army Retaliates Against Ms. Beckford**

55.     In addition to ignoring Ms. Beckford's repeated efforts to report and put an end to the conduct described above – which began less than a year after she began working at BAACH and continued until the oppressive conditions forced her to transfer to a new duty station – the

14

Army also retaliated against Ms. Beckford for engaging in protected EEO activity.  Specifically,

and as described in greater detail below, despite Ms. Beckford's skill and dedication to her job

and outstanding performance reviews throughout her tenure at BAACH, shortly after

Ms. Beckford began engaging in protected EEO activity, Ms. Beckford was (1) directed to

perform additional but uncompensated work duties, (2) never promoted or given a pay raise

while she was employed at BAACH, (3) excluded from communications and meetings with

BAACH leadership, and (4) denied a Permanent Change of Station ("PCS") award when she

departed BAACH as the result of the hostile work environment she experienced.

56.     *First*, beginning soon after Ms. Beckford complained of the hostile work

environment at BAACH created by Carey, Army leadership began directing that Ms. Beckford

perform additional duties that were not part of her regular work duties.  For example,

Ms. Beckford was required to be "on call" 24 hours per day, seven days per week as an

Executive Medicine Program Manager.  In addition, Ms. Beckford was required to devote

significant time outside of her normal work hours supporting a hospital training course, including

picking trainers up from the airport and their hotels, and setting up the training room over a

weekend.  Ms. Beckford also was made responsible for conducting behavioral health background

checks for all civilian hires on the Yongsan installation, a task she was forced to complete before

and after business hours given the many other demands on her time during the workday.

Although other BAACH employees consistently received overtime pay for undertaking such

additional, after-hours duties, Ms. Beckford was never similarly compensated.  Furthermore,

Army leadership was hostile to Ms. Beckford's repeated efforts between 2010 and 2012 to

request that her additional duties be transferred to other employees, or that she receive overtime

compensation for this work.  This was so despite the fact that BAACH Command was aware that

Ms. Beckford consistently had been amassing additional duties throughout her tenure at BAACH

that had required at least four changes to her position description, and that this workload was

unmanageable and overwhelming for any single employee.

57.     *Second*, even though most other employees received a pay raise each year, and

even though – as described above – Ms. Beckford was increasingly performing a significant

number of tasks far beyond her original position description, Ms. Beckford never received a

promotion or raise at any time during her employment at BAACH.  In fact, when Ms. Beckford

confronted Barrett about her salary in 2011, Barrett refused to entertain the possibility of a raise,

and informed her that the GS-12 pay grade was the highest compensation level her position was

eligible for.  However, after Ms. Beckford left BAACH, her position was posted – not just once,

but four times – at the GS-13 pay grade.  Relatedly, on numerous occasions between 2010 and

2014, Ms. Beckford requested but was denied position description evaluations, which the Army

regularly conducts to determine whether an employee's pay is commensurate with their duties.

Ms. Beckford repeatedly requested position description evaluations – particularly since her

position description had expanded several times throughout her tenure at BAACH – but Army

leadership refused to evaluate her position description.  As a result, Ms. Beckford was denied the

re-evaluation of her pay – and the very likely determination that a pay raise was required – that

would have accompanied such an evaluation.

58.     *Third*, beginning in 2011 after Ms. Beckford made complaints about Richter's

behavior and attempted to resolve her concerns through mediation, Ms. Beckford began to notice

that Richter was excluding her from e-mails, trainings, and meetings involving her team –

including e-mails concerning the community briefings she previously had been responsible for

making on behalf of the Hospital Commander.  In addition, after engaging in protected EEO

16

activity involving Richter, Richter refused to meet with Ms. Beckford face-to-face.
Ms. Beckford had similar experiences with Irwin.  Beginning in November 2013, Ms. Beckford
noticed that she was being excluded from communications regarding management meetings.
Indeed, Irwin acknowledged to Ms. Beckford that Command was pulling her out of such
meetings, and he told her that she "never should have spoken up."  And another colleague
informed Ms. Beckford that Army Command met to discuss her complaints and the fact that
Ms. Beckford was "becoming a problem."

59.     *Fourth*, in the months leading up to her departure from BAACH, Ms. Beckford
requested – but was denied – a PCS award, which awards civilian military employees all
expenses relating to a move to a new duty station.  The Army grants PCS awards as a matter of
course to employees who have no disciplinary record; indeed, because Ms. Beckford processed
all awards at BAACH, she was aware that PCS awards were routine.  However, although Ms.
Beckford had not been subject to any Army disciplinary action, she never received the PCS
award she requested in 2015.  A PCS award for one of Ms. Beckford's direct reports – which
Ms. Beckford requested the same day as her own – was quickly granted, even though that
employee had a disciplinary suspension on her record.

**IV.     As the Result of the Army's Failure To Address or Improve the Hostile Work
Environment at BAACH, Ms. Beckford Begins the Process of Initiating an EEO
Complaint and Determines She Can No Longer Remain Employed at BAACH**

60.     Despite Ms. Beckford's years-long efforts to address the hostile work
environment at BAACH through her complaints to various management officials, the only action
the Army took to resolve her concerns was the 2010 15-6 investigation concerning Carey, which
was an internal investigation not involving the EO or EEO, and which did not put an end to the
discrimination and harassment Ms. Beckford endured at work.

61.     Frustrated with the Army's repeated failures to improve the hostile work environment at BAACH, on or around December 7, 2013, Ms. Beckford contacted Revere to discuss her concerns about the ongoing harassment she was confronting.  Ms. Beckford and Revere exchanged correspondence via e-mail, and as part of that discussion Revere asked Ms. Beckford to provide her with documentation from her previous mediations involving EEO employee Galimore.

62.     On or around December 8, 2013, Ms. Beckford e-mailed Galimore to obtain the documentation Revere had requested.  In response to the e-mail, Galimore became aggressive and accusatory.  Galimore called Ms. Beckford – and subsequently met with Ms. Beckford in person – to insist that, despite the fact that Ms. Beckford expressly had asked Galimore to serve as a mediator during the 2011 and 2013 mediations, she had not been assisting Ms. Beckford in an official EEO capacity.

63.     On or around December 9, 2013, Ms. Beckford e-mailed Revere to describe the interaction with Galimore and to clarify her understanding that Galimore had been serving in an EEO capacity during their prior interactions and the 2011 and 2013 mediations.  Revere did not respond to that e-mail.

64.     Over the course of 2014, Ms. Beckford repeatedly attempted to follow-up with Revere about her workplace concerns, and to request time to meet with Revere in person to discuss possible solutions.  Revere refused to work cooperatively with Plaintiff – indeed, at times Revere failed to respond to Plaintiff's e-mails and phone calls for months at a time – and did not take any action in support of Ms. Beckford's complaints.

65.     Frustrated with Revere's unresponsiveness and her failure to process her complaints in a timely manner, Ms. Beckford also reached out to the United States Office of

Special Counsel and the Army Inspector General throughout the course of 2014 in the hopes that those efforts would force Revere to take action on her complaints.

66.     These efforts to elevate her complaints were met with some success, and in late October 2014 Revere e-mailed Ms. Beckford and asked her to sign a DA Form 7509 – an Army form used to process complaints of discrimination.  Ms. Beckford signed the DA Form 7509 so that Revere could begin processing her complaint.  Ms. Beckford continued to attempt to prod Revere into action, including, among other things, by contacting directly the United States Army MEDCOM EO.  Revere began working on Ms. Beckford's case thereafter.

67.     The Army's callous, distrustful, and dismissive response to Ms. Beckford's last-ditch effort to improve the conditions at BAACH through EEO complaints further compounded the feelings of anxiety, worthlessness, and hopelessness Ms. Beckford's repeated abuse at BAACH had engendered.   To that end, Ms. Beckford determined that she no longer could remain employed at BAACH, and would need to seek transfer to a new duty station.  The Army's discriminatory conduct, its resulting retaliation, and Ms. Beckford's painful decision to resign her position caused Ms. Beckford to suffer, and continue to suffer, irreparable loss and injury, including but not limited to pain and suffering, loss of enjoyment of life, deterioration of physical and mental health, loss of social standing and damage to reputation, and emotional stress and feelings of depression and hopelessness.

68.     In 2015, Ms. Beckford was hired to be the Chief of the Clinical Support Division at the Army hospital on Joint Base Lewis McChord in Washington State, a GS-13 position that entailed coordinating hospital administration for the entire Pacific region, including South Korea. Ms. Beckford arrived in Washington to assume that position in December 2015.

69.     In March 2015, after Ms. Beckford's EEO complaint was investigated and completed, Ms. Beckford was given the choice to pursue mediation, or to file a formal charge with the EEOC.  Ms. Beckford elected to file a formal complaint, which she timely filed on March 17, 2015, and the Department of Defense Defense Civilian Personnel Advisory Service Investigations and Resolutions Directorate conducted an investigation.  The Army produced a Report of Investigation on or around November 16, 2015.

70.     On or around December 7, 2015, Ms. Beckford submitted a request for a hearing before an EEOC administrative judge in lieu of receiving an agency decision.  Ms. Beckford withdrew that request on or around November 7, 2017, and the administrative judge dismissed the request for a hearing and returned to case to the Army for a final agency decision based upon the evidence in the case file.

71.     On or around January 22, 2018, counsel for Ms. Beckford received Defendant's January 8, 2018 final decision

## CLAIMS FOR RELIEF

### COUNT I

**(Hostile Work Environment in Violation of Title VII of the
Civil Rights Act of 1964, as Amended, 42 U.S.C. § 2000e *et seq.*)**

72.     Ms. Beckford incorporates by reference the allegations in paragraphs 1-71 as though fully set forth herein.

73.     Ms. Beckford suffered a hostile work environment when, within the workplace and despite numerous requests and complaints, she was subjected to frequent use of racial slurs and derogatory comments about her gender.  In addition, Ms. Beckford repeatedly was forced to

complete demeaning and degrading tasks based on her gender, which reflected humiliating and stereotypical assumptions about her sex.

74.     The use of these slurs, comments, and degrading demands both ridiculed and insulted the racial and gender groups of which Ms. Beckford is a member and was sufficiently severe and pervasive to alter the conditions of her employment and create an abusive working environment.

75.     Ms. Beckford did not tacitly or explicitly welcome this harassing conduct.

76.     The slurs, comments, and degrading demands singled out African-Americans and women, and therefore constitute conduct because of Ms. Beckford's race and gender.

77.     Responsible Army officials had actual notice of the harassing conduct because of Ms. Beckford's repeated complaints about it.

78.     Responsible Army officials refused to take steps to mitigate the harassment and create a safe and lawful working environment for Ms. Beckford, including failing to take steps to punish the individuals Ms. Beckford reported, or to force those individuals to attend EEO or sensitivity training.

79.     The Army's lack of response to Ms. Beckford's complaints of discrimination was based on Ms. Beckford's race and gender.

80.     The Army's harassing conduct and its lack of response thereto constitutes a discriminatory hostile work environment in violation of 42 U.S.C. § 2000e *et seq*.

81.     As a direct and proximate result of this hostile work environment, Ms. Beckford has suffered, and in the future will continue to suffer, irreparable loss and injury, including but not limited to, economic loss, humiliation, embarrassment, mental and emotional distress, anxiety, and the deprivation of her rights to equal employment opportunities.

21

82.     Through the Army's own actions and the actions of its employees, agents, and/or representatives described above, the Army acted intentionally, maliciously, oppressively, and with willful, callous, wanton, and reckless disregard for Ms. Beckford's rights.

## COUNT II

### (Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as Amended, 42 U.S.C. § 2000e *et seq.*)

83.     Ms. Beckford incorporates by reference the allegations in paragraphs 1-82 as though fully set forth herein.

84.     In violation of Title VII, the Army discriminated against Ms. Beckford because she made a charge of employment discrimination.  Ms. Beckford engaged in protected activities including, but not limited to, requesting EEO mediations, filing internal complaints with Army leadership, and filing EEO complaints.

85.     As a result of Ms. Beckford's protected activities, the Army took adverse actions against Ms. Beckford, including, but not limited to, the following:

a.     Assignment of additional work duties outside of the scope of the job she was hired to perform, without any additional compensation or overtime payment;

b.     Denial of pay raises and promotions;

c.     Exclusions from e-mails and meetings that fell within the responsibilities outlined in the position description for her role; and

d.     Denial of a PCS award.

86.     The Army unlawfully has retaliated against Ms. Beckford in violation of Title VII by taking a materially adverse employment action against her in response to protected activity.

22

87.     As a result of the Army's discriminatory and retaliatory actions, Ms. Beckford has suffered economic loss, humiliation, embarrassment, psychological and emotional harm, severe emotional and psychological distress, and damage to her career.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.     Declare that the practices described in this Complaint have created a hostile work environment in violation of 42 U.S.C. § 2000e *et seq.*;

B.     Issue a permanent injunction prohibiting Defendant from engaging in the discriminatory employment practices described herein and from engaging in all retaliatory activities against Ms. Beckford, and further requiring Defendant to take steps to foster an inclusive environment for African-Americans and women to the same extent it does for other racial groups and other genders;

C.     Issue an order directing Defendant to take the following actions:

     i.      Award Plaintiff compensation for unpaid overtime work;

     ii.     Award Plaintiff a PCS and the benefits and entitlements connected thereto; and

     iii.    Update Plaintiff's personnel file to show work performed that was not reflected in her position description for Deputy Chief of Clinical Support at BAACH;

D.     Award Plaintiff actual, compensatory damages in an amount to be proven at trial;

E.     Award Plaintiff appropriate punitive damages;

F.     Award Plaintiff reasonable attorneys' fees and costs; and

G.     Award any other relief this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands trial by jury on all Counts of the Complaint.

April 20, 2018                                 Respectfully submitted,


   /s/ *Katherine C. Cooper*
Katherine C. Cooper (No. 1026047)
*Attorney of Record*
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC  20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
kcooper@kellogghansen.com

Matthew K. Handley (No. 489946)
Dennis A. Corkery (No. 1016991)
WASHINGTON LAWYERS' COMMITTEE
   FOR CIVIL RIGHTS AND URBAN
   AFFAIRS
11 Dupont Circle N.W., Suite 400
Washington, DC 20036
Telephone:  (202) 319-1000
Facsimile:  (202) 319-1010
matthew_handley@washlaw.org
dennis_corkery@washlaw.org

*Attorneys for Plaintiff Shawlawn Beckford*

24